Ms. Watson, would you like to call the next case, please? 17-0732 MEABF & LABF v. Municipal Employees' Annuity & Benefit Fund Anne, will counsel on our next case please approach? Please identify yourselves and tell us who you represent. Good morning. Clint Criswell on behalf of the plaintiffs petitioning for attorney's fees in Johnson v. Johnson. MEABF participants, LABF participants against the MEABF letters that were cited in the interview. Good morning, Your Honor. Michael Slade for the City of Chicago. Good morning, Your Honor. It's John Shapiro for the other Plinkett group opposing the common claim portion of the fee petition. That's the Jones case? The Jones plaintiffs, yes. And Mr. Criswell, do you have somebody here with you this morning? I'm here with Mr. Criswell. Okay. And how much time would you like? I guess as much as I can, if they're both arguing, I'll reserve five minutes for both. Okay, so 15 minutes and five? Yes. All right. And how do you propose to divide your argument? Your Honor, we propose to split the time, 50-50, 10 minutes a piece. Okay. If that pleases the court. And I will tell you all that we have read the briefs, we're familiar with the record, and so you can assume that you can jump right in. All right, Mr. Criswell. Justice Mason, Justice Hyman, Justice Lavin. We are attorneys whose work helps produce the result, voiding the legislation, cutting back the COLAs and restoring the COLAs, forcing the repayment by the city to bring the COLAs current, and making the COLAs permanent for people's lives. Why would you be entitled to what your opponents call a double recovery? What you're asking for here is actually a multiplier of six. When you take 200,000 plus 1 million, that's 1.2. You get 200,000 approximately in time. So two times six is 1.2. So you're asking for an enormous multiplier according to the class action cases. What would give you the ability to go out on to two funds, you know, the common fund and get paid for your time? We're not looking for 1.2. We're looking for a total of just under one. So it's five times. It's a multiplier of five. You want 250 from one side. The result on a common fund basis, we have helped produce a benefit that totals somewhere between, depending on when you count it out, to a minimum of $300 million. But that's irrelevant. You're asking if there's a statutory fee under the Civil Rights Act. We'll discuss whether that's appropriate or not. And then you're asking for a common fund fee. You're asking for both. Right. So, again, whatever the five or six, the fact is it's a tremendous multiplier. Why do you get to go for both? Because the benefit. What case? There's a bunch of them. Superior, we've cited them in our petition. They give you two? Superior Beverages, one, additional judges, and Unisys or the other federal case where they said, the purpose of the two sources is that the common fund reflects something approaching the value that has been produced. The statutory fee, really, when you think about it, is to compensate, is to encourage plaintiffs, even who have no significant monetary damages, to bring cases. And so the result is that a combination of the two, call it one offset by the other, a million dollars offset by the 200-some thousand that the city would have to contribute, adds up to a very reasonable fee, whether we're talking about 200,000 for the Lodestar, 250, I think, and increasing that by the three times. That's not the issue here, with all due respect. The issue here is whether a fee can be constituted from both segments. So where's the case that did that, that said, we're going to award class counsel their time that the defendant is going to pay. Right. And then we're going to assess the class another $750,000. Those cases are superior beverage. There's a bunch of them that are cited because the concept is there's a fee that comes from the benefit produced, and there's a fee, and really, because the statutory fee belongs technically to the plaintiff, not to counsel. That offsets the amount that the common fund produces. And the two elements provide an incentive to do great work, the best that you can, and tags the defendant with the non-enhanced time it took to do it. But you have no case in Illinois that says that, Illinois State case. No. Okay. And the issue has not really been addressed. Well, and you have no case where, under the Civil Rights Act, they've received something, somebody's received something above or beyond the statutory? In Heaton, actually, what happened was they determined that you couldn't do the statutory fee, but they gave a common fund fee. And so in Heaton, that was the circuit court awarded that substantially. But Mr. Shapiro will probably tell you that that's true. Because that's not in the record. In the circuit court? Circuit Court of Cook County? No. Circuit Court of Sangamon County? Oh, Sangamon County. Okay. It's not an appellate case. No, it's not. So we don't consider it. Right. Understood. This is a first-time issue before this court. So, okay, let's go to the statute. Civil Rights Act. This case had nothing to do with discrimination. You agree with me? Nothing to do with discrimination? Unless you want to say it was slandering against retirees. No. There was no claim. Did you bring a claim on discrimination? Let's put it there. We did not. We brought it for a violation of Article 13, Section 5. I understand. Did you cite in your complaint the Civil Rights Act? The Civil Rights Act? Yes. In your complaint, did you say something about, all right, we can get fees under civil rights. Somehow, somewhere, when you filed this case, that it was known that somehow you were connecting this case to the civil rights. We probably have a request for fees in there. No, that's not my question. My question is, did you cite? I think the answer is no, but. I don't know, to tell you the truth. I doubt it. I think you're probably right that it was not specifically cited in there. No, I didn't see it. But the cause of action is not the Civil Rights Act. The cause of action is to enforce Article 13, Section 5. The Civil Rights Act grants fees for enforcing. The Civil Rights Act provides fees for enforcing that which is under the Civil Rights Act. Well, it says you can do it one of two ways. You can do it under the Constitution or A and B, 5A and 5B. There's two ways to do it. But what you're saying is, well, we don't need to cite in our complaint. We don't need to tell anybody that we're going to bring this into this Act, and then later on we can file a brand-new case and get fees under an Act that was not in any way involved in our original case. That's what you're saying. No. What we're saying is that the fee entitlement springs from having succeeded in enforcing the constitutional pension rights. Well, then why didn't you say that in your original complaint? Because we asked for it. I'm sure we mentioned fees. But if you want to. But, you see, if you're going to ask for fees under an Act, eventually, that's where you ask for it. You don't file a separate case for fees. Give me another situation. Do you have any other situation like this where a separate case has been brought in order to get fees under an Act that was never cited or discussed or involved in the original case? My question is, is there such a case? I don't know. You don't know of it? I don't know of any that requires you to plead the attorney's fees basis as the Act in the original case. Well, how else would you be able to get fees if you never – if in the original – you're asking for fees in Case A and another case – in Case B, right? This is the second case. This is a brand-new case. No. This is the case that it was in. But it's – you're bringing up the Act, having never raised it previously, and having no discrimination claim. No, we – it's not a discrimination claim. That's right. But the Act provides fees not just for discrimination claims, but for enforcing Illinois constitutional rights. And there's a case that says – Thomson, or how do we pronounce it? Thoman says – Thoman says – Just reason. Right. That it only applies to discrimination. Hasbro says there is no such limitation. There is no limitation. And that's where we are. And those are the two cases that deal with the issue of whether there is a limitation of within that statute. Well, why shouldn't we follow that there is no – there is a limitation because it is in the Civil Rights Act. And since you didn't – I mean, this would be – again, you never even mentioned it in your original complaint. We mentioned fees in our original complaint. Not the Civil Rights Act. So that means you could have brought in fees under any act in the state of Illinois that you thought could possibly give you fees, right? You could – From this case, yes. In fact, there isn't a case that says you have to plead the basis for entitlement in the original complaint. There isn't a case. I don't think they'll cite a case either because I don't think there is one. That has – that would be a new impediment. If you want to disincentivize anybody from bringing public interest cases. Well, but – no, it would. Because under the Civil Rights Act, it's right there. So everybody knows that you can give fees. It's under the Illinois code – it's under the Illinois revised code. It's the ILCS. It is not – it is not just in the act. It is in the code. What do you mean by in the code? The code. The ILCS is – What is in the code? That's what the Illinois code is. The Illinois code is a bunch of statutes. Oh, oh, oh, oh. So anything mentioned in any statute is free game in any case? If it would give you attorney's fees in such a case. And this is explicit because the provision itself would just be redundant. There's no purpose to it. Why? Because – no, because the purpose is because if you have a discrimination claim under Section B, it says you can get fees under Section B or under C for enforcing a right under the Illinois Constitution. And that's what we did. No, no, no. It's a Civil Rights Act. That's the purpose. This act is a Civil Rights Act. That's the thing you don't want to talk about. That's like saying that the U.S. code is a bunch of discrete acts which don't interrelate to each other and which don't have general language or which don't have language applying to each other. The 1942 U.S.C., 1988 has no such limitation, but it's clearly in the Civil Rights Act. And clearly it grants fees for a whole slew of things that were not – that don't need to be mentioned in the first complaint. I mean, you're imposing an artificial constraint for an amount that is a very small amount. The concern about whether or not we get paid for bringing a case like this and pursuing a case like this is of such small item to the city, but is very important for people who want to bring cases to enforce their rights. So what you're proposing is for the $750,000 that class members are going to pay, you're going to deduct $5 a month for people who retired during what? It was a two-year period, 2013, 2014, something like that, right? We're just going to take $5 out of their check to pay the fees that are awarded under the common fund theory. Right, and only the first year. So would it be okay if the legislature did that in order to cure the pension problem? All we're going to do is take $5 out of your check. That's all. They could do that.  They can't do that. The legislature probably could not legislatively reduce it, but our Supreme Court has said in Bishop v. Burgard that the common fund entitlement to fees comes ahead of. The guy that produced the recovery. You're doing what you said the legislature can't do. Legislature absolutely cannot solve the pension problem by even deducting $5 a month from annuitants' pension because the Constitution absolutely prohibits that. But the right of a lawyer to get paid trumps that? Good luck with anybody bringing these cases in the future. How are you going to find somebody to bring these cases? They did, and he's sitting at council table behind you. Right. Whenever there's a union case. Your imagination is disproved by this very case, the Jones Council. Disprove what you just said. We both participated. It doesn't matter. Your statement was if you hadn't participated, I think Jones still would have been very successful. You didn't make any arguments different than what Jones made. We did. Well, we did. From the beginning, we wanted this to be a summary judgment case. They made it into a fact-finding and extensive. What their effort did was it cost a lot of time that was, in the end, totally unnecessary. They went through the preliminary injunction hearing. It took more than a week. They went through a whole slew of things, discovery. It's a pure issue of law, as is this. The amount, whether you like it or not, the amount is really not at issue here. The issue here is whether the statute is to be interpreted in its plain language, which is not limited to discrimination, and whether the common fund issue, the common fund, the who produced your recovery comes ahead or who helped produce it. I didn't say we were the sole, but without us, there was only one of the constituent groups involved. And also, the fact is that the unions are not generally part of the bargaining unit, and so whether they had standing or not on a challenge would be a question. We provided both the second group, against whom the city very likely would have said, well, that's a different thing. We're going to litigate that again. The fact of the matter is we provided the plan for how the case should proceed. Whether they agree with us or whether the court agrees with us, we had a very narrow track, which was this is a pure question of law. The statute cutting people back and stopping paying these COLAs for more than a year is unconstitutional. It's a pure question of law should be decided on summary judgment. That's what we fought for. And we did not try to add to the time. We asked very pointed questions. They may say, look, you didn't do all this stuff. And the answer is we didn't think all this stuff was necessary and all this stuff wasn't necessary. It was always a pure question of law. We represented both constituent groups rather than just one union representing one constituent group. Sometimes there will be a union, but most of the time on pension rights, there won't be. And we've done these cases, and the fact is nobody comes in generally unless there's something, some motivation. We've done cases in the pension code fighting for people's rights, and we've gotten them established. And sometimes we haven't gotten paid, and sometimes we have. But if you don't have, there isn't two tiers of Illinois constitutional rights. It's not a constitution saying, well, these are rights that we'll protect, and we want to encourage people to defend. And these are those that are just home and motherhood. Article 13, Section 5. If there is such a two-tier system, it doesn't apply to Article 13, Section 5. And pension rights, which the Supreme Court has said are individual rights, are necessary to have that enforcement. Because if you don't have a way to enforce them, without regard to whether there's a monetary recovery, individuals wind up being maltreated and have no means of getting help. So this isn't really on the law, Mr. Krizlog. Why don't you focus on, you've got a couple of issues, you have a couple of minutes. Plain language of the law, we think, awards us fees in this. The decision below is purely on the legal structure. Brundage says the court has discretion of either or. It doesn't say either. It says to choose the lodestar or the common fund. But the fact is, in the federal plane, there are lots of cases, and we cite them. And I can only name the two, like Judge Will and Unisys. Judge Will and Superior Beverage and Unisys. They said it's not, the concept is that the common fund gets you the recovery for the incentive for what produced the recovery, and it is offset by the lodestar, by which the defendant, on a non-enhanced basis, reimburses the plaintiff, essentially, for the cost of bringing the case. Brundage allows you to do it either way or both, as the court may deem appropriate. Putting off class certification until the end of the case, and then saying, well, it's moot, and so there's no need to do it and you're against the class, is fundamentally, I think it's bad policy. And on the attorney fee discovery issue, the fact is, in federal court, there is an absolute rule that if you're going to oppose fees, you have to show your own fees. And that is a rule that this court should adopt, because what it would do is it would discourage. We don't adopt rules. Pardon? We don't adopt rules. Well. We cite cases. We adopt procedures. The courts of appeals all the time establish the way in which things are to be done, and we think, and we ask for discovery. There's no rule requiring it, as there is in the federal system, but it would be good direction to the circuit judges to say, where you have somebody opposing a fee, you have to disclose, that person has to disclose the fees and their billing rates, because otherwise you make it a one-way, often non-bonafide attack on fees. And somebody like the city can drag things out, because one thing that they do, you know, it's one thing. The city doesn't mind so much apparently having to pay $400 million, $500 million over time, but paying legal fees, they're something that they will invest no end of money to discourage people from fighting. Speaking of legal fees, your colleagues spent some time talking in their briefs about the American rule, and I assume that you're in favor of that, right, the American rule? If it says American before it, I'm generally in favor of it. I understand the concept that generally each person pays their own fees. Right, because in this case, if you were to, by chance, hypothetically lose this appeal, you wouldn't want to be paying their legal fees, would you? It's a different issue. It's a different question. They didn't produce anything here from me. But the American rule wouldn't. The English rule is a different rule. The English rule says generally. They saved $5 per month per member by opposing your fees. So they did have a benefit, which is very similar to the benefit that you say you want to be paid for. So they should get a benefit under the common fund doctrine against you if they wanted to, and they don't have to even – it's in this case. So, you know, if we send it back, they could just go and ask for fees against you because they created a benefit. If they want to do that in the future, it's a free country, and I think that would be – Can we get back to what I think – what I think you're really asking is why should they have – why should the retirees have to pay for some of this out of the recovery? And the answer is that under Bishop against Burghardt, dealing with ERISA, the common fund claim compensating the people who produced – Was Bishop a class action? Pardon? Was Bishop a class action? Probably. Probably. There's a whole series of those common fund cases in Bishop. We had a few of them with health care. There were bunches of those common fund claims dealing with the insurance companies, dealing with ERISA, dealing with plans. And the concept is important, and frankly, if it could be awarded, in our brief, we make it clear that we think it should be done on the basis that the court can give notice to all the participants. And everybody who wants to object in some way, if they want to, it's fine. We believe in the class action vehicle with its notice and protection. And so it's fine with us if on remand the court does give notice that a fee is being asked for, that we'll take a piece. I don't see any lights up. We don't use lights, but you are out of time. So do you want to make a last point? I'll save the rest for response. All right. Thank you. Okay. And Mr. Slate, is it you're going first? Good morning, and may it please the Court. I'm Mike Slate. I represent the City of Chicago. The city intervened along with the state below to defend the constitutionality of the legislation on the merits. I will be handling the ICRA issue, and my colleague, Mr. Shapiro, will be handling the common fund issue. We were actually the ones against each other primarily below, and now we're standing here on the same side on appeal, which I'm not sure how often your honors have that, but it's a first for me that my opponent below is now my friend. And our position is very straightforward. We think the appellate court in the Thoman case got it exactly right, and we're asking you to follow the Thoman case. ICRA has been on the books for 15 years, and no court has adopted an interpretation of ICRA that's consistent with Mr. Krizlov's argument. Thoman, as your honors know, was a challenge under the constitution to a portion of the Firearm Concealed Carry Act. And what the appellate court did was it held that ICRA provides for fee shifting in cases where plaintiffs succeed in policing conduct that is covered by ICRA, whether the claims are pled under ICRA itself or under the Illinois Constitution. And the court read ICRA correctly. Subsections 5 and B create a state statutory cause of action for a claim of discrimination based on suspect class. The basis of that claim can either be under the statute or a state constitutional cause of action under the Equal Protection Clause. And language regarding the Illinois Constitution in C2 allows a prevailing party who brought a discrimination claim on both or either ground to be entitled to attorney's fees. And that's exactly what the Illinois legislature was trying to do when it passed ICRA. Now, the Supreme Court was presented with the opportunity to take the Thoman case, and was presented with the exact same argument that is being made here, that the Gray case is inconsistent, which we don't think it is, and they declined to take the case. So I think what happened here was that Thoman correctly held that the General Assembly passed ICRA to address a very specific problem with a very specific solution. The problem was the Supreme Court's decision in the Sandoval case. So prior to that, the law was very clear. Pre-Sandoval, plaintiffs could bring a lawsuit for disparate treatment or disparate impact, and they could get, if they won or if they got a victory or if the defendant gave up, they would win and they would get their fees. So the Illinois General Assembly was dealing with that specific problem. That case, you may recall, was a 5-4 decision by the Supreme Court, authored by Justice Scalia, that overturned decades of law that was very consistent among all the federal courts. And so the General Assembly got and changed that. And what Mr. Griswold says in his reply brief at least once is exactly right. This is on page 7 of his reply. ICRA was enacted to provide a remedy for acts of discrimination. That's exactly right, and that's what the title of the act says, discrimination prohibited. And the cases he cites are actually inconsistent with his position. My favorite of them is the Chief Elinowick case that this division decided in 2006. That was a case where the Illinois Native American Bar Association was arguing that ICRA had overturned existing law that designated Chief Elinowick as the mascot officially of the University of Illinois. And this Court rejected that argument and described what ICRA was passed to do and what it did. What this Court said is that it is clear from the legislator's comments and from the language that ICRA was not intended to create new rights. It merely created a new venue in which plaintiffs could pursue in the state courts discrimination actions that had been available to them in the federal courts. That's exactly right, and if that argument is right, which this Court held in 2006, Mr. Griswold's argument must fail. Similarly, he cites the Rao v. Gandhi case that was decided down the street by Judge Kendall in the federal court, and that is a very typical national origin discrimination case. And what he does is he cites a sentence in the middle of the opinion that says that when interpreting ICRA, courts look to the guidance of the federal courts governing civil rights statutes. But the two previous sentences right before the sentence he cites specifically describe what ICRA does. Section 5 of the ICRA was not intended to create new rights, but merely created a new venue, state court, for discrimination claims under federal law. That's exactly what the legislature was trying to do. The legislative history is very clear, and it supports that. The one quote he raises out of context where one of the legislators specifically talks about bringing in private plaintiffs' lawyers who would pursue these claims. Just a little bit later, that same exact legislature said, oh yeah, I want everybody in the General Assembly to know that this creates no new exposure for the state. So even the legislator that he relies on makes clear that his argument is flawed, because if he's right and ICRA created fee-shifting automatic in all constitutional cases, that would be a sea change in Illinois law. That has never been accepted by any court. Any time a plaintiff raised any claim under the Illinois Constitution, there would be fee-shifting. It would not only change how discrimination cases are pledged. It would change how Fourth Amendment cases are pledged. It would change how many, many types of cases are pledged and approved in the state courts. And there's no evidence that our legislature was trying to do that. Why would it change the way they're pledged? Because what he's saying is I don't have to cite it. I don't have to even come under the act. I can just bring it up later on at the end. I hate to help my opponent, but I will here just because I want to correct. I looked when you were chatting with Mr. Krizloff. There is a sentence in his complaint where he does specifically cite this provision of the Civil Rights Act. It's not fair to say that he didn't. Okay, so he pled it. He did. He did pledge it. So I don't want you to be under a misapprehension, because it's C-33 of the Commonwealth Act. But the law is actually, you know, there are no cases out there that support how Mr. Krizloff interpreted ICRA. And if the General Assembly were trying to do what he says, if the General Assembly were trying to create fee shifting in all cases, it would not have done so in a subsection of the specific law that was passed titled Discrimination Prohibited that was intended to restate existing law and not expand it. That doesn't make sense. That's not what happened. So under Mr. Krizloff's interpretation of ICRA, if somebody filed a deck action under the single subject rule against legislation, they would be entitled to fees. And if they invoked the home rule provisions of the Illinois Constitution, they would be entitled to fees. That's his argument. We cited a bunch of examples in our brief of this, you know, due process claims, religious freedom claims, the right to bear armed claims. If you're challenging the non-uniformity of your real estate taxation, that's a provision in the Illinois Constitution. If Mr. Krizloff is correct, you get fees for that. And that is certainly not what the General Assembly was trying to do. And the proof is in the pudding, of course, because no court has ever accepted this in the 15 years that ICRA has been on the books. I'm, you know, I'm typically on the defense side. My opponents are usually very talented and very creative in coming up with arguments for fees. And the fact that no such time has ever happened before now is evidence that the General Assembly did not have what Mr. Krizloff sets in mind. The other point I would like to make is what Justice Lavin raised in colloquy with Mr. Krizloff, which is the American rule. You know, the American rule also definitely supports our argument. I'm not asking Mr. Krizloff to pay my fees if I win this appeal. I would really just like the circuit court decision to be affirmed. But the American rule is very helpful to me because what is very clear under the law is that any attorney's fee statute is supposed to be strictly construed because it is in derogation of the common law, American rule. And the Illinois Supreme Court has held this, you know, several times in cases that we have cited in our brief. The Sandholm case and the Taylor case are good examples. In Sandholm, that was an anti-slap case where the defendant prevailed and sought its fees because that's what the statute provided for. But the Illinois Supreme Court narrowly construed the statute, said, oh, defendant, you're only entitled to a very small portion of your fees because I have to interpret the statute by the Illinois Supreme Court in light of the American rule, and it has to be strictly construed. That was a provision where the actual substantive law, the anti-slap provision, is broadly construed as Mr. Krizloff claims should be applied to ICRA. Even in scenarios where you broadly construe substantive provisions of a statute, you still strictly construe the attorney's fee provision. And I would challenge the fact that the comparison that the appellant makes between the ICRA and 1983, I mean, those two things are not even close to comparable. Federal statute 1983 creates a federal cause of action for the violation of any constitutional provision or any provision of federal law. ICRA does something totally different. It's very narrow. It's specific to discrimination claims, and this is not one of them. So unless Your Honors have any additional questions, I would just sum up by saying that there's one on-point case that was decided a couple of years ago. It directly rejects the appellant's position. We ask Your Honors to follow it. Second, the whole point of ICRA is in its title, discrimination prohibited. And there's no reason to think that the General Assembly was trying to massively expand the State's exposure to fee shifting in nondiscrimination cases. Unless Your Honors have any other questions, I would seize the rest of my time. Thank you, Mr. Slade. Mr. Shapiro. Good morning, Your Honors. As we indicated before, I'm going to focus solely on the common fund, the only portion of the Johnson plaintiff's fee petition that the Jones plaintiff's challenged. And in urging this Court to use its equitable authority to order a common fund to take portions of vested pension benefits from current retirees to pay a success fee to Mr. Krisloff and his firm, the Johnson plaintiffs and the Krisloff law firm ignore very important things that were in this underlying litigation, the reason they purportedly participated in the litigation. And that is because the pension clause of the Illinois Constitution mandates, as the Illinois Supreme Court has found, that people are entitled to 100% of the pensions they have been promised. It's that simple. Justice Hyman, you asked a question why Mr. Krisloff didn't seek fees in his complaint. There's good reason, because he can't get fees, he can't get a common fund under the Illinois Constitution and the pension code. The circuit court correctly held that there was no common fund. Mr. Krisloff and the Johnson plaintiffs were not entitled to this success fee. So when the legislature enacts something that infringes on the pension protection clause, and Mr. Slade says you can't get fees under ICRA and you say you can't get common fund fees, who can you find to represent the annuitants? I'm here, Your Honor. I was a participant and honored to represent public labor in what Mr. Krisloff referred to as the Heaton law firm. That was the case, excuse me, that was the litigation involving the state pension systems. We, Freeborn and Peters, represent the We Are One Illinois Coalition and a number of current and retired members of the state pension funds impacted by the legislation that the Illinois Supreme Court held in the Constitution. And so the ability then to pursue this type of litigation depends on the public participation and the pension funds getting together to kind of form this umbrella organization that will finance the litigation. Well, that's one possibility, but the Illinois Supreme Court has found on several occasions that there might have been litigation brought on behalf of a taxpayer or others who benefited from the litigation, but there was no common fund form. That was the Hamer case and the Rosemont case and the Hoffman case, if I have it correctly, cases that we cited in the brief. In each of those situations, the court found that a tax was inappropriate and the plaintiff's counsel said, well, okay, we've saved lots of money, lots of money going into the future, as Mr. Krisloff says here, and we should be awarded a portion of that because we've created this benefit. What Mr. Krisloff says is saving taxes is one thing because you're basically saying you're saving money, give me part of the money you save. He says what he did was increase the annuitants, restored the annuitants entitlement to the cost of living. And so it's actually there is money coming to the annuitants that otherwise wouldn't have. I mean, I disagree with Mr. Krisloff's interpretation. Yes, had no one stepped up and challenged the act, the Illinois Supreme Court in this case held unconstitutional, annuitants, current retirees and those who retire in the future would have received lesser automatic annuity increases. And there were other aspects of the act that were also unconstitutional. But it's the same thing, for instance, in the Hamer case where the court invalidated a property tax assessment. There the plaintiff said we're overassessed and there's another group up in Lake County that was underassessed. And the court agreed. And so it was the same thing going into the future. Those people who prevailed got more money in their pocket. That's the practical result of it. And there was some way in that case that the court could have assessed a certain amount of fee that should have been awarded to the common fund. But the court was very clear, the Illinois Supreme Court said that doesn't create a fund that comes within the court's purview. There is no way to disrupt, I think is the word that the Supreme Court used, the taxing authority that would go on. And that's precisely the same thing here. You yourself, Justice Mason, indicated the Illinois legislature clearly can't say we're going to salvage the pension problem by reducing annuitants, automatic annuity increases by $5 a month. A small amount, Mr. Krisloff says. It doesn't make a difference. We would disagree with that characterization, but it doesn't make a difference because the legislature can't do it. And respectfully, this court can't use its equitable authority to do what the Pension Protection Clause says the federal branch of government. It requires that the people that Mr. Krisloff claims to represent would get 100% of their pensions. It's a little bit peculiar because Mr. Krisloff seeks a common fund success award. But there's really, if you get to the bottom of it, nothing common about what he asks. It's very uncommon. The named plaintiff, Mr. Johnson, wouldn't have to pay anything under Mr. Krisloff's theory. His association, which is a plaintiff in Mr. Krisloff's case, of which Mr. Johnson is president, wouldn't have to pay anything for Mr. Krisloff's fees. But the retirees who are members of the LAVF, each would have to pay a portion of the success fee. That flies in the face of a common definition of what's common. What he asks is not common to the class that he purports to represent. And moreover, there's nothing common about asking for a fee that violates both our Constitution and the anti-alienation provisions in the Code itself. Mr. Krisloff, at base, ignores the Pension Protection Clause of the Illinois Constitution, the very right that he stands before the Court and says he should be awarded for upholding. And again, our Illinois Supreme Court has said it's unequivocal, right? That's the highest law of our land, and it's unequivocal. It cannot be violated. The success fee here would violate it. Mr. Krisloff refers to two cases in his reply brief that suggests that he can avoid the application of the Pension Protection Clause here. One is the Bishop case that you asked about, Justice Mason. That was a single plaintiff case. It is inopposite here, both factually and legally. In fact, I would submit that it supports our position. There, it was a very different situation. The Plaintiff's Counsel for the single plaintiff helped recoup from the tortfeasor monies that were then repaid to Blue Cross Blue Shield that had previously been paid to cover the plaintiff's medical damages. And the plaintiff's attorney said, well, I should get a portion of that because I recovered it. And Blue Cross Blue Shield said, no, you don't get any of it. And the Court said, no. There, the Plaintiff's Counsel provided benefits to this non-party, the plaintiff. Here, Mr. Krisloff doesn't, hasn't provided any benefit to the clients. Instead, he seems to take, seeks to take monies, vested pension benefits from the people that he purported to represent. Can't do it. And the Kenerva case, which Mr. Krisloff cites, I wasn't involved in that. He referred to it as the Heaton case from the Sangamon County Court. In the Heaton case, the state pension litigation in which we, again, represented a number of individual active employees, retired employees, members of the state pension funds in the We Are One Illinois Coalition. No plaintiff group in that case sought fees under any theory, even though we were quite successful in clarifying the absolute protection that the Pension Protection Clause provides. And in Kenerva, it's true that the Court awarded some attorney's fees in there, but not a single party in that case objected to what went on. So the issues that are presented here in Mr. Krisloff's case were never raised in the Kenerva case. They were never challenged. We never went up on appeal. And I would say this Court does not have to abide by the Kenerva case, which doesn't even explain the basis for its decision. So I think the Pension Protection Clause is the ultimate backstop here. And for the same reasons, the anti-alienation clauses in the pension codes themselves that govern both NEABF and LABF provide the same protections in this case that the Pension Protection Clause provides. Mr. Krisloff, again, cites in his reply brief a couple of cases that he says hold that the anti-alienation provisions shouldn't apply here. One is the Milgram case, but that case was very clear in explaining when the anti-alienation clause applies. And what it said is you can't, and there are a number of cases where the anti-alienation clause applies. The Court found that the benefits at issue were not vested benefits. And that's the difference. Mr. Krisloff has cited a number of ERISA cases in which there were settlements paid by third parties that had nothing to do with the vested benefits. In none of those cases did vested benefits come from plan B. And in fact, the cases that he cites, the other one, the Roda case, made perfectly clear that you can't do it. And there, relying on Hickman, a case that we cite in our brief from the Second Circuit Federal Court of Appeals, the Court explained that the principle behind these anti-alienation clauses is that you can't involuntarily levy against vested pension benefits. But that's exactly what Mr. Krisloff does. And in the court quoted from Hickman said that such a prohibition supports Congress's primary objective of ensuring through ERISA that if a worker has been promised a defined pension benefit upon retirement, and if he has fulfilled whatever conditions are required to obtain a vested benefit, he actually receives it. That same rationale applies to the Illinois Pension Code's anti-alienation clause. And that same rationale applies to the Pension Protection Clause. That's the very reason the citizens of Illinois ratified the Pension Protection Clause. Of course, and we've touched on this, ultimately the court doesn't have to decide on the constitutional or the statutory grounds. The court could affirm the circuit court's ruling based on its own judgment. But there is no common fund in this case. Again, there is no fund created in this case that comes within this court's jurisdiction. It's very different from the Bishop case, for instance, on which Mr. Krisloff relies, where there was a fund, a recovery that was within the court's purview. Hamer, I would submit, is directly on point as the circuit court found. Mr. Krisloff says the court erred in failing to certify a class, or at least consider his class certification motion. The court was well within its discretion to defer ruling on that issue. In fact, Mr. Krisloff ignores that he did so with good reason. That's because the underlying lawsuit, both the ones that we, Freeborn and Peters, brought and the one that Mr. Krisloff brought, involved a facial challenge. If any portion of the Act failed as to one member of one of the pension funds, it would fail as to everybody. There is absolutely no reason in this type of case to certify a class. So I appreciate that Mr. Krisloff was involved in the underlying litigation, but for purposes of ease, it makes no difference that he and his clients decided to get involved. As the Illinois Supreme Court found, the Act was inseverable. The Act itself said that. It was inseverable. If any of the pension diminishments in that Act were held unconstitutional, it was unconstitutional as to every member of both funds impacted. All right, Mr. Shapiro, do you want to wrap up? I was just about to do that. Thank you, Your Honor. Public pensions are protected from involuntary diminishments. That's precisely what Mr. Krisloff seeks to do by asking the Court to use its equitable authority to award him and his firm a success fee. And again, they shouldn't cry foul. The law is clear. In Hamer, in Roselott, in Hoffman, it's just a few of the examples that sometimes counsel bring cases that may have unconstitutional benefits to others, but it doesn't create a common fund from which they can obtain fees. That's just the nature of litigation. It benefits one person, but it may benefit all other similarly situated individuals. And I know Mr. Krisloff is concerned about who's going to be here to help defend these pension rights, and I can assure the Court my clients will be, as we were in the state pension cases. And as these other cases show, no doubt many other groups will be as well without seeking an award of common fund or other fees. Thank you for your time. Okay, Mr. Krisloff, briefly. Where's Freeborn and Peterson and all these other people in the healthcare cases which have been going on for 30 years against the city of Chicago? Where were they in Sklodowsky? Where were they in Ryan? This isn't about that. The assurance that don't worry about it will be there. They won't be there unless the union that supports that particular cause chooses to be. I appreciate Mr. Slade's candor in going through the complaint, and it reminds me of how I learned about the provision in the Civil Rights Act from another lawyer. And so we did put in the complaint, and I guess we put it in the complaints now with all the pension cases. The denial of a PLA is not evidence of anything. It could easily, it could just as well be interpreted as why with a well-funded gun lobby do we need to address this issue now? Because there was no problem. We're talking about funding a challenge to the concealed carry restrictions. But Cannon said that unless you get a judgment on something, you can't get a fee, and this was made, and the change to the ICRA was made, or the addition of the ICRA to the code, including the provision. The provision didn't need to include a mention of the Constitution. All it needed to say was there's a cause of action for discrimination, and a successful person who brings an action under subsection B can get fees. They didn't do that. They added in this provision, which says if you just read it, plain language, you know, I love it when they say we're all the strict constructionists when we need them. Statute says what it says. If you succeed in recovering successfully, enforcing a right under the Constitution. Now, there's two aspects that that brings on. One is this limitless liability. In this case, we're talking about, as against the city, $200,000 or 250. It wouldn't matter. I mean, if you're right, you can ask for $10 million against the city because that's what ICRA provides for. No, because the imposition of fees on the defendant is only based on the lodestar unapproved time. Right. So let's say this litigation went on for 10 years, and you incurred $10 million in fees. Under your interpretation of ICRA, the city's got to pay, right? Well, there are two responses. The answer is yes, but number one, we're talking about a liability of $8 billion, which has been established, to which a $10 million fee, if the city dragged it out for that long, is still of de minimis significance compared to the liability imposed on the city. And so any time anybody sues under the single subject rule, under the Constitution, under home rules, they're going to pay reasonable fees, right? Reasonable fees. Yes. I mean, that's your interpretation. I'm not sure if the, whether it's the single sum, but I would say Article 13, Section 5 is one of those provisions that ought to. Well, does your interpretation depend on which provision of the Constitution is at issue? No, but I don't doubt that the courts may over time establish some sort of a, whether it's not a pecking order, but, you know, that the challenge when they cite Hamer and stuff like that, that just says where there isn't, that just says where there's no recovery, where there's de minimis whatever, there's no harm. The cases are fairly insubstantial amounts compared to the amounts at issue. Yes, I do think that a clear reading would say, and that would deter, it would deter governments from just saying, let's litigate to the end, regardless of how long it takes. Because there is the commitment of taxpayer money. Governments are very willing. And the city of Chicago is probably the strongest in this respect. You can drag this out forever, and it is far more expensive to people who want to challenge the system than it is to the city. So when Senators Fritchie and Herman said this is not an expansion of the liability, pre-existing liability, they were just wrong about that. You know, if the statute is clear, you can find, somebody will say something in the legislature. And so legislative history, if you want to cite Justice Scalia, he doesn't believe in citing legislative history at all. Read the statute, and if the statute says this, this is what the law is. Irrespective of the remainder of the statute. Well, but the statute doesn't limit it. This provision wouldn't be necessary. If you want to read the statute as being only discrimination cases, this provision is redundant and of no use. Because if it's to only award fees in discrimination cases, that's what subsection B is about. No, but defendants would then say, okay, you get fees on count one that charge discrimination, but you don't get it on count two, because that was an equal protection. But discrimination is a violation of equal protection. Exactly. But they would be redundant then. You don't get a double recovery, and we're not looking for a double recovery. You would only get the recovery for your time in the case. If you want to parse it between, and generally the courts don't parse it between the counts that you succeeded on and the counts that you failed on. They count it based on your success in the case. If they wanted to do it in a different way, it would not happen in the way that you described, because equal protection would be a discrimination claim, and there wouldn't be a double fee awarded. Finally, the common fund issue, the difference between Hammer and Rosemont and Hoffman and this, is that here there is, there was an amount, a hard dollar amount, produced and will be forthcoming in the future, every year for these people's lives, real cash, under the jurisdiction of the court. There's no, they wouldn't dispute that the funds are. It's not under the jurisdiction. The court would have to order the funds to withhold money. It's not, there's no fund under the court's jurisdiction where the court can say, okay, pay out this much in fees, and the rest goes to class members. The funds, the funds are under the court's jurisdiction and could be so ordered. It's different from a case like Hammer, where it said, you know, you don't have to pay taxes of an amount in excess of what you should have to pay. Whether the single, the uniformity rule or whatever. It's different from a case where there isn't money from the defendants that is paid under the jurisdiction of the court. These payments are clearly, and these funds are within the jurisdiction. The public pension funds do not, cannot be counted on to challenge the city in these cases. We have found in all these cases, public pension funds are the willing compliance, as they were here, to the city's legislation. Bishop, Bishop it was not, they're correct, Bishop was not in itself a class case. Bishop was an individual case, but it was clear that the anti-alienation provision of ERISA comes after the common fund. Having produced it, and we think that the alienation, the anti-alienation provision is really, if properly read, should be viewed as where somebody gets a judgment against you separately. They cannot execute on your, on your pension. And the city can't reduce your pension. But, where someone's efforts helped produce a greater amount than you were getting before. Yes, it should be, the common fund should come ahead. Finally, this concern is probably addressed by the fact that even if the pension fund said that this would reduce the amount that comes into the fund for the annuitants, the city still has to, under the current structure, the city still has to fund the pensions to the point of being able to pay the annuitants. Being 90% funded by the year 2055. So, you know, if on a class basis, that's what we said, put it out for the annuitants. And if they objected, that would be a consideration. My guess is, it would be hard to envision a serious objection, but we're fully willing to have that taken on. We believe in the class vehicle for accomplishing these things. Mr. Shapiro isn't always there, won't be there, hasn't been there. We've been there, and in this case, we serve to function. Thank you to all counsel for your arguments here this morning and for your briefs. We will take the case under advisement.